[652 NYS2d 315]

SHARON A. SILER et al., Respondents-Appellants, v 146 MONTAGUE ASSOCIATES et al., Appellants-Respondents, and BORO PHOTO CO., INC., Respondent.

Second Department, January 21, 1997

34

## APPEARANCES OF COUNSEL

*Clausen Miller, P. C.,* New York City *(James T. Ferrini* and *Edward M. Kay* of counsel), and *Myles R. Elber,* Brooklyn, for appellants-respondents. (One brief filed.)

*Baumeister & Samuels, P. C.,* New York City *(Michael F. Baumeister* and *Douglas A. Latto* of counsel), for respondents-appellants.

*Smith Mazure Director Wilkins Young Yagerman & Tarallo, P. C.,* New York City *(Mark Yagerman* and *Steven I. Brizel* of counsel), for respondent.

*Wilson, Elser, Moskowitz, Edelman & Dicker,* New York City *(Alan Kaminsky* and *Richard E. Lerner* of counsel), for New York City Housing Authority, *amicus curiae.*

## OPINION OF THE COURT

SANTUCCI, J.

In this case we confront the issue of whether a landlord, who has been sued for negligence in an action based upon premises security, can seek apportionment of liability pursuant to CPLR article 16 against a nonparty intentional tortfeasor. We conclude that this question should be answered in the affirmative.

This case has its genesis in a terrifying physical assault upon the plaintiff Sharon Ashley Siler. The facts are as follows. In April 1989, Sharon Ashley Siler lived with her husband, Jeffrey Siler, on the top floor of 146 Montague Street, Brooklyn. The Silers, who had lived in the building since February 1982, leased their apartment from the defendant 146 Montague Associates, which owned the building. 146 Montague Associates is a limited partnership whose general partners are the defendants William Hurcomb, Jose Lugo, and Sandra Kaufer. The building is a brownstone structure containing two businesses and two residential apartments.

At the time of the incident in question, the street-level storefront was occupied by the defendant Boro Photo Co., Inc. (hereinafter Boro Photo). The president of Boro Photo was Allen Kaufer (hereinafter Kaufer). Kaufer was married to Sandra Kaufer who owned 80% of the shares in Boro Photo and was a general partner in 146 Montague Associates. William Hurcomb, also a general partner of 146 Montague Associates, owned the remaining 20% of the shares in Boro Photo. Although Kaufer worked for Boro Photo and not the landlord, he did collect rent from the tenants in the building, took care of complaints, and oversaw building maintenance. Kaufer was not paid by 146 Montague Associates. Hurcomb was vice-president of Boro Photo. Hurcomb also handled tenant complaints and collected rent.

In 1988 an individual by the name of George Rivera was in Boro Photo when he overheard Kaufer having a conversation concerning the high cost of plumbing repairs. Rivera interrupted to tell Kaufer that he was capable of performing plumbing repairs and that he charged substantially less than licensed plumbers. Kaufer then took down Rivera's name and told him that he would contact him.

Shortly after this meeting Kaufer called Rivera to perform work on the building's boiler. Kaufer did not ask Rivera for any references and knew that he was not a licensed plumber. Thereafter Kaufer called on Rivera at various times to do plumbing repairs in the building. When the work required access to an apartment, either Kaufer or Hurcomb would arrange for the tenant to be home or for the tenant to leave keys with one of them in the office of Boro Photo. When a tenant left the keys, either Kaufer or Hurcomb would give the keys to Rivera but would not accompany him to the apartment or otherwise supervise his work.

In late 1988 through the early part of 1989, the Silers were experiencing problems with the toilet in their apartment. The Silers informed either Kaufer or Hurcomb of the problem and were instructed to leave their keys at the office of Boro Photo so that the plumber could obtain access to the apartment during the day. On the morning of April 12, 1989, the Silers left their keys with Kaufer for that purpose.

Later that same afternoon Sharon Ashley Siler (hereinafter the plaintiff) came home for lunch at approximately 2:00 P.M. and found Rivera in her apartment repairing the toilet. When the plaintiff left at 3:00 P.M., Rivera remained in the apartment to perform the necessary work. When the plaintiff

returned home that evening she retrieved her keys from Hurcomb. Unbeknownst to the plaintiff, however, Rivera had made a copy of her keys at some point during the time he was in possession of them.

On April 28, 1989, the plaintiff arrived home sometime after 3:00 P.M., and as she ascended the stairs to her apartment, she noticed that the door was half open and called out to see if her husband was in the apartment. As she entered the apartment the plaintiff was greeted by Rivera who had gained access by using the copied keys. The plaintiff told Rivera that she did not know he would be returning to do additional repairs and Rivera responded that he was there to double check if everything was in working order. Rivera then asked the plaintiff to help him remove items from atop the toilet lid so he could inspect the tank. After she assisted Rivera, the plaintiff noticed a duffel bag in the middle of the floor and that the apartment did not look "right". The plaintiff told Rivera that she was going to call either Kaufer or Hurcomb to find out if Rivera was supposed to be in the apartment.

As the plaintiff reached for the telephone Rivera came from the bathroom, wrapped his hand around her neck and threw her to the floor. There then followed a vicious attack upon the plaintiff in which Rivera repeatedly banged her head against a radiator, causing her to twice lose consciousness, attempted to suffocate her with a pillow, and finally slashed her with a knife about the hands, chest, face, and ankles. Finally, Rivera ceased his attack, grabbed the duffel bag, and ran out of the apartment. The plaintiff ran after him but collapsed in the building's vestibule screaming for help. Responding to her screams, Hurcomb, along with a police officer who was nearby, transported the plaintiff to a hospital.

In September 1989 the plaintiff and her husband commenced this action to recover damages for the injuries she suffered as a result of Rivera's attack. Named as defendants in this lawsuit were 146 Montague Associates, Jose Lugo, William Hurcomb, and Sandra Kaufer, the general partners of 146 Montague Associates, and Boro Photo. Mr. Rivera was not named as a party defendant.* In their complaint the plaintiffs sought damages from the defendants based upon negligence and negligent hir-

---

* On July 10, 1990, Rivera pleaded guilty to attempted murder in the second degree, robbery in the first degree and burglary in the first degree as a result of his attack on the plaintiff. It is conceded that jurisdiction could have been obtained over Rivera if the plaintiff had chosen to name him as a defendant in this lawsuit.

ing. In April 1993 the liability portion of the trial of the action commenced.

After the plaintiff rested on the issue of liability the defendants moved to amend their answer to "include the affirmative defense of [CPLR] Article 16". The plaintiff opposed the motion and moved "to preclude the application [of CPLR article 16] in this case". After hearing argument from both sides the court granted the defendants' motion to amend their answer, but also granted the plaintiff's motion "to exclude Article 16 from the facts of this case". Specifically, the trial court stated:

"I do not believe that Article 16 is applicable under the facts and circumstances of that [sic] case. I think that it was not the intention of the Legislature to have an intentional tortfeasor be made part of the suit of this kind where the action against the landlord, or whoever else may be involved, is based on negligence.

"Under those circumstances there would be absolutely no basis for [sic] reason for Article 16 to exist".

At the conclusion of the liability portion of the trial the jury unanimously found that both 146 Montague Associates and Boro Photo were negligent and that their negligence was the proximate cause of the plaintiff's injuries. The jury also found that Boro Photo was an agent of 146 Montague Associates. After the trial on damages the jury awarded the plaintiff the principal sum of $1,250,000, $750,000 of which was attributed to pain and suffering up to the date of the trial and the remaining $500,000 was awarded for future pain and suffering including the permanent effects of the injury. The jury also awarded Jeffrey Siler the sum of $100,000 for loss of services. Prior to the entry of judgment the court granted the motion of the defendant Boro Photo to set aside the verdict as to it. The court held that "there is absolutely no proof whatsoever in the record to link whatever actions Mr. Kaufer may have taken to Boro Photo".

The appealing defendants argue, inter alia, that the court erred by not applying CPLR article 16 to this case. The plaintiffs have cross-appealed contending that the court improperly set aside the verdict as against Boro Photo.

CPLR article 16 was enacted in 1986 as part of a legislative package commonly known as the "Toxic Torts" bill (L 1986, ch 682). Historically, tortfeasors had been jointly and severally liable to a plaintiff. Thus a plaintiff could recover the full amount of damages awarded to him or her from any culpable

tortfeasor named in the lawsuit with a sufficiently "deep pocket", despite the fact that this deep-pocket defendant may have only been marginally culpable. This inequity was somewhat rectified by the enactment of CPLR article 14, which allowed one tortfeasor to claim contribution from a joint tortfeasor according to their respective degrees of fault. However, the plaintiff's right to collect the full judgment from one tortfeasor was generally unaffected under CPLR article 14 *(see, Sommer v Federal Signal Corp.,* 79 NY2d 540, 556).

Public calls for reform of the joint and several liability rule and concerns about other issues affecting the liability insurance industry were addressed by an Advisory Commission formed by then Governor Cuomo. CPLR article 16 emerged as a modified version of the Advisory Commission's recommendation to make defendants severally liable for noneconomic loss *(see,* Governor's Mem approving L 1986, ch 682, 1986 McKinney's Session Laws of NY, at 3182-3183).

CPLR 1601, entitled "Limited liability of persons jointly liable" states in pertinent part as follows: "1. Notwithstanding any other provision of law, when a verdict or decision in an action * * * for personal injury is determined in favor of a claimant in an action involving two or more tortfeasors jointly liable * * * and the liability of a defendant is found to be fifty percent or less of the total liability assigned to all persons liable, the liability of such defendant to the claimant for non-economic loss shall not exceed that defendant's equitable share determined in accordance with the relative culpability of each person causing or contributing to the total liability for non-economic loss; provided, however that the culpable conduct of any person not a party to the action shall not be considered in determining any equitable share herein if the claimant proves that with due diligence he was unable to obtain jurisdiction over such person in said action".

CPLR 1602, entitled "Application", provides in pertinent part: "The limitations set forth in this article shall * * * 5. not apply to actions requiring proof of intent".

As can be seen from the above-quoted sections, CPLR 1601 sets forth the criteria for the apportionment of liability among multiple tortfeasors. CPLR 1602 then limits the application of CPLR 1601 by excluding certain types of actions, including those requiring proof of intent. Thus, it is clear that in an action which arises solely from negligence and which involves two or more tortfeasors, a defendant whose liability is found to be 50 percent or less can limit his liability to the plaintiff even

if the other tortfeasor(s) is not a party to the action, provided of course that it has been shown that jurisdiction over the nonparty could have been obtained. Similarly, it is clear that where a plaintiff seeks damages for an intentional tort against multiple intentional tortfeasors, the defendants may not invoke CPLR article 16 *(see, Pantages v L.G. Airport Hotel Assocs.,* 187 AD2d 273).

What is not readily apparent is whether CPLR article 16 should be applied to the hybrid factual situation where a plaintiff's injuries arise out of a combination of both negligence and intentional tort. In other words, in premises security cases, such as the one at bar, are the landowners, whose actions are merely alleged to have been negligent, precluded from invoking CPLR article 16 where there is an intentional tortfeasor?

Before answering this question, it is important to remember that the plaintiffs concede that jurisdiction over Rivera could have been obtained. This is not a situation where the intentional tortfeasor was unknown or one in which he went unapprehended. Accordingly, assuming that the liability of any of the defendants was less than 50 percent, this action would come within the "general category" provisions of CPLR 1601. However, the inquiry does not end here. CPLR 1602 contains 12 exceptions to the general rule set forth in CPLR 1601 (1). The issue here is whether the exception set forth in CPLR 1602 (5), which states that apportionment of liability "shall * * * not apply to actions requiring proof of intent", applies to this case.

As noted above, the plaintiffs' action is one founded solely upon negligence. Although Sharon Siler's injuries were primarily due to the actions of an intentional tortfeasor, this does not alter the fact that the plaintiffs' lawsuit only asserts causes of action to recover damages for negligence, and does not require proof of intent. Accordingly, the apportionment principles of CPLR 1601 are implicated since CPLR 1602 (5) is not intended to limit the application of CPLR 1601 *unless* the intent of the defendant is at issue *(see, Smith v McCain,* NYLJ, Dec. 2, 1992, at 24, col 4; *see also,* Siegel, NY Prac § 168C, at 252 [2d ed]).

Such a conclusion is supported by the memorandum to the Governor, prepared in conjunction with the passage of this statute, which states that the proposed legislation would not apply to "instances in which the defendant's acts, upon which liability is based, were performed * * * intentionally in concert with others" (Attorney-General's Mem to Governor re S 9391-A,

Bill Jacket, L 1986, ch 682, at 2). This statement reflects the legislative intent to merely exclude the application of CPLR 1601 where multiple intentional tortfeasors committed an act, not to deprive the negligent tortfeasor from invoking the statute against the intentional tortfeasor.

Moreover, it would be contrary to the remedial purpose of CPLR article 16 to conclude that negligent tortfeasors cannot come within the purview of the statute merely because they may be jointly liable with an intentional tortfeasor. As the dissent correctly remarks, CPLR article 16 is in derogation of the common law and thus must be strictly construed. Nevertheless, the statute should not be so construed that it cannot remedy the very "evil" which it was intended to address *(Matter of New York Life Ins. Co. v State Tax Commn.,* 80 AD2d 675, 677, *affd* 55 NY2d 758; *see,* McKinney's Cons Laws of NY, Book 1, Statutes § 95). "The policy behind the common-law rule which imposes joint and several liability upon tortfeasors who contribute, in whatever degree, to the same injury is based upon the sense that compensation of the relatively innocent victim serves a more important purpose than striking a nuanced balance between and among the relatively guilty" *(Robinson v June,* 167 Misc 2d 483, 488). However, CPLR article 16 changes the common law and was intended to address the inequity which occurs when "the disparity between minor fault and major financial punishment becomes extreme" *(Robinson v June, supra,* at 489).

While there are many factual scenarios which can be conjured in order to demonstrate this "disparity", one example will suffice to illustrate the point. Defendant No. 1 (hereinafter D1) accidentally pushes or propels the Plaintiff (hereinafter P) into a sharply protruding object maintained by Defendant No. 2 (hereinafter D2). P sues D2 for negligently creating or maintaining a foreseeably dangerous condition. D2 may properly seek to have D1 share the fault and the damages. If, however, D1 had willfully pushed P, then under the reasoning of the dissent, D2 could not possibly seek apportionment of liability from D1, even though D1 was the more blameworthy. This result is incongruous, and would perpetuate the evil which the Legislature was seeking to correct in enacting CPLR article 16. Similarly, if the appellants herein were not allowed to invoke the provisions of CPLR article 16, the remedial purpose of the statute would not be advanced and, in fact, the inequity which it was intended to address would be fostered.

Accordingly, we conclude that the appealing defendants, whose actions are alleged to have been merely negligent, were

not precluded from seeking an apportionment of liability against the nonparty intentional tortfeasor, Mr. Rivera. Therefore, the Supreme Court should have allowed the jury to determine George Rivera's share of fault in causing Sharon Siler's injuries and if the verdict resulted in a finding that any of the appealing defendants was less than 50% at fault, the provisions of CPLR article 16 relating to the apportionment of liability should have been applied.

The damages awarded to the plaintiffs were not excessive and thus there is no need to modify the jury's determination in that respect.

The Supreme Court properly set aside the verdict with respect to the defendant Boro Photo (see generally, Nicastro v Park, 113 AD2d 129). The evidence failed to establish that the corporate entity, Boro Photo, acted as an agent for 146 Montague Associates or that it was in any way responsible for the plaintiff's injuries.

We have reviewed the parties' remaining contentions and find them to be without merit.

RITTER, J. (concurring in part and dissenting in part). Because I believe that the Legislature intended to exclude intentional tortfeasors from apportionment of liability pursuant to CPLR article 16, I respectfully dissent from so much of the majority's opinion as would remit this action to the Supreme Court, Kings County, for a new trial on liability.

I agree with the majority that the rule of joint and several liability, which traces its roots deep into the common law (see, Burrows v Rhodes [1899] 1 QB 816), serves the salutary purpose of allowing for full recovery by the injured party rather than "striking a nuanced balance between and among the relatively guilty" (Robinson v June, 167 Misc 2d 483, 488; see, Siegel, NY Prac § 168A, at 247 [2d ed]). This long-standing rule was modified, in some cases profoundly, by the enactment of CPLR article 16. As noted by the majority, CPLR article 16 emerged as a modified version of a report prepared by the Governor's Advisory Commission on Liability Insurance. The "primary initial focus" of the Commission was the "liability insurance crisis" being faced by public entities such as municipalities, which in many cases, despite limited culpability, were being held liable for the entire verdict in actions and relegated to the futile pursuit of their often more culpable, but less solvent fellow tortfeasors for contribution (1 Report of Governor's Advisory Commn on Liability Ins, letter of Chairperson Jones, Apr.

7, 1986). Thus, "[t]he legislative history of [CPLR] Article 16 suggests that its central thrust is to discourage suits against municipalities and others with large insurance coverage or, at the very least, to permit such defendants the opportunity to settle their liabilities at reasonable sums" (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C1600:1, 1996 Pocket Part, at 222). However, when it became clear that CPLR article 16 would potentially deprive many an injured party of full recovery, the Legislature, especially the Assembly, voiced strong objections and, "[i]n its haste to achieve a compromise that would be acceptable to both plaintiffs' and defendants' bar * * * hurried through a bill that is permeated with ambiguities, overlappings and a style, grammar and syntax that often prove exasperating" (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C1600:1, 1996 Pocket Part, at 221). The compromises struck are, in large part, embodied in CPLR 1602, which limits the application of CPLR article 16 by declaring that it will not apply in 11 (now 12) enumerated categories. At issue here is the construction of CPLR 1602 (5), which excepts from the application of CPLR article 16, "actions requiring proof of intent."

Exhaustive research has failed to reveal any source materials illuminating the legislative intent underlying the enactment of the exceptions of CPLR 1602, which have been described as having "the elegance and clarity of the Internal Revenue Code" (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C1602:1, 1996 Pocket Part, at 228). Thus, the application of general principles of statutory construction are controlling. Where, as here, a statute is in derogation of the common law, it must be strictly construed, "to the end that the common law system be changed only so far as required by the words of the act and the mischief to be remedied" (McKinney's Cons Laws of NY, Book 1, Statutes § 301 [a], at 460; see, Oden v Chemung County Indus. Dev. Agency, 87 NY2d 81). Thus, this Court is enjoined to construe the exceptions of CPLR 1602 broadly so as to preserve the common-law rule of joint and several liability to the greatest extent possible. Applying this rule of construction, CPLR 1602 (5), which exempts from the application of CPLR article 16 "actions requiring proof of intent", must be construed to exempt the conduct of intentional actors from being factored into an apportionment of liability among tortfeasors pursuant to CPLR article 16, even if such intentional conduct was a

proximate cause of the injuries sustained *(see, Splawn v Lextaj Corp.,* 197 AD2d 479; *Pantages v L.G. Airport Hotel Assocs.,* 187 AD2d 273; 1 NY PJI 2d 548 [1996 Supp]). Such a result is supported by logic. It is against public policy to insure a party for damages intentionally inflicted, or for his or her own criminal acts *(see, e.g., Astoria Quality Drugs v United Pac. Ins. Co.,* 163 AD2d 82; *Carlson v Travelers Ins. Co.,* 35 AD2d 351; 69 NY Jur 2d, Insurance, § 686). Indeed, to the extent insurance exists, liability policies commonly exclude coverage for injuries intentionally caused by the insured *(see, e.g., Allstate Ins. Co. v Mugavero,* 79 NY2d 153; *Home Ins. Co. v American Home Prods. Corp.,* 75 NY2d 196; *Matter of Town of Huntington v Hartford Ins. Group,* 69 AD2d 906; 70 NY Jur 2d, Insurance, § 1416). Thus, the broad exclusion of CPLR 1602 (5) expresses a reasonable policy decision by the Legislature to strike the balance between full recovery for the injured party and fairness to the tortfeasors by excluding from the application of CPLR article 16 those parties who necessarily have a limited potential for assets. The inequity of finding to the contrary is made manifest by the case at bar, wherein application of CPLR article 16 will result in the plaintiff bearing the cost of whatever damages are to be apportioned her assailant, who is now serving a lengthy prison term for his intentional and vicious crime.

I cannot agree with the reasoning of the majority, nor that of the case cited therein, *Smith v McCain* (NYLJ, Dec. 2, 1992, at 24, col 4), that the fact that the defendants were held liable solely for negligence, rather than intentional conduct, negates the application of CPLR 1602 (5). The damages claimed by the plaintiff arose from the savage beating she suffered at the hands of her assailant, an act that was clearly intentional. Thus, although the defendants were merely negligent in enabling the attack to occur, such negligence became actionable by reason, and upon proof, of the assailant's intentional conduct. Indeed, here, the causal connection between the negligence of the defendant tortfeasors and the criminal conduct of the plaintiff's assailant is much more direct than in many cases concerning premises liability *(see, e.g., Rosario v New York City Hous. Auth.,* 230 AD2d 900 [landlord's failure to install working locks on front and back doors to building]).

In sum, applying basic rules of statutory construction, and viewing CPLR article 16 in light of the mischief it was intended to remedy, it must be concluded that the Legislature, in enact-

ing CPLR 1602 (5), intended to exclude from consideration criminal or intentional acts when apportioning liability pursuant to CPLR article 16 and, therefore, to avoid casting back upon the injured victim of such acts the loss of that portion of the damages attributable to the party or parties who will, in all likelihood, be the least solvent. Accordingly, I would affirm the order and judgment appealed from in all respects.

ROSENBLATT, J. P., and COPERTINO, J., concur with SANTUCCI, J.; RITTER, J., concurs in part and dissents in part in a separate opinion.

Ordered that the order and judgment is modified, on the law, by deleting therefrom the second decretal paragraph and the fourth through seventeenth decretal paragraphs; as so modified, the order and judgment is affirmed, insofar as appealed from, without costs or disbursements, the jury's findings of fact as to damages are affirmed, and the matter is remitted to the Supreme Court, Kings County, for a new trial on the issue of liability at which the jury shall apportion fault among the defendants 146 Montague Associates, and William Hurcomb, Jose Lugo, and Sandra Kaufer, as general partners of 146 Montague Associates, and George Rivera, and for entry of an appropriate amended judgment; and it is further,

Ordered that the order and judgment is affirmed insofar as cross-appealed from, without costs or disbursements.